# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JASON MARTA,

               Plaintiff,

    v.

CDCR,

               Defendant.

No. 1:20-cv-00072-KES-FRS (BAM) (PC)

**FINDINGS AND RECOMMENDATIONS DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

(ECF No. 40)

**FOURTEEN (14) DAY DEADLINE**

## I.    Introduction

Plaintiff Jason Marta ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. This action proceeds against Defendant California Department of Corrections and Rehabilitation ("CDCR") for violation of the ADA.

Currently before the Court is a motion for summary judgment filed by Defendant CDCR ("Defendant") on the ground that Plaintiff's medical records reveal that he lacked a medical necessity for a lower-bunk accommodation when he first requested it, and any subsequent requests for accommodation were timely and appropriately addressed by his doctors and Reasonable Accommodation Panel. (ECF No. 40.)[1] Plaintiff filed an opposition to the motion for summary judgment on September 25, 2023. (ECF No. 43.) Defendant did not file a reply, and the deadline to do so has expired. The motion for summary judgment is fully briefed. Local

---

[1] Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment. (ECF No. 40-2); *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1988); *Klingele v. Eikenberry*, 849 F.2d 409, 411–12 (9th Cir. 1988).

1

Rule 230(l).

For the reasons set forth below, the Court recommends that Defendant's motion for summary judgment be denied.

## II.     Legal Standards on Summary Judgment

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its

opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.  Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties.  Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.    Discussion**

> **A.        Undisputed Material Facts ("UMF")**[2]

Plaintiff's Reasonable Accommodations History

1.  Title 15 of the California Code of Regulations, section 3999.394 regulates accommodations provided to inmates.  Under those regulations, CDCR "shall provide

---

[2] *See* Defendant's Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment.  (ECF No. 40-1.)  Plaintiff did not comply with the rules in preparing his opposition, including by failing to reproduce Defendant's Statement of Undisputed Facts and providing "a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support" of any disputed facts, or providing a statement of disputed facts.  Local Rule 260(b).  As a result, Defendant's Statement of Undisputed Material Facts is accepted except where brought into dispute by Plaintiff's verified complaint and portions of his opposition to the motion for summary judgment signed under penalty of perjury. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence); *Johnson v. Meltzer*, 134 F.3d 1393, 1399–1400 (9th Cir. 1998) (same, with respect to verified motions).  Unless otherwise indicated, disputed and immaterial facts are omitted from this statement and relevant objections are overruled.

3

medically necessary accommodations to [inmates] to ensure equal access to prison services, programs, and activities." Cal. Code Regs. tit. 15, § 3999.394(a). Additionally, the Armstrong remedial plan specifies the following: "It is the policy of the CDC to provide access to its programs and services to inmates and parolees with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. . . . All institutions/facilities housing inmates with disabilities will ensure that housing and programming are reasonable and appropriate in a manner consistent with their mission and Department policy." Armstrong Remedial plan, at 1. (ECF No. 40-4 ("Davi Decl.") ¶ 3.)

2. CDCR inmates can request a disability-related accommodation by submitting a Reasonable Accommodation Request, CDCR Form 1824 ("Form 1824"), or by completing a CDCR Form 602, CDCR Form 602-HC, or CDCR Form 22. The CDCR Form 1824 Reasonable Accommodation Request asks the inmate to identify the access issue for which they are requesting an accommodation, explain why they are having the issue, and identify what accommodation they need. (*Id.*)

3. The CDCR Reasonable Accommodation Panel ("RAP") reviews and responds to inmate requests for accommodations. The Reasonable Accommodation Panel evaluates Form 1824 requests using the reasonable accommodation standard. (*Id.* ¶¶ 3–4.)

4. The RAP considers evidence relevant to the inmate and their requested accommodation and provides reasonable accommodations to requesting inmates consistent with the California Correctional Health Care Services ("CCHCS") Comprehensive Accommodation Formulary Guidelines. (*Id.* ¶ 4.)

5. The RAP response to an inmate's request for a medical accommodation is provided to the inmate with a notice informing them of their right to file a grievance if they disagree with the decision. (*Id.* ¶ 5.)

6. However, if an inmate has a "medical necessity" for an accommodation, a Primary Care Provider may recommend that an inmate receive the accommodation. An accommodation remains valid so long as the accommodation remains "clinically indicated," meaning the

4

inmate has a present medical need for the accommodation.  (*Id.* ¶ 3.)

7.  A bottom-bunk accommodation is for inmates who need to be assigned to a bottom bunk because their medical condition prevents them from accessing a top or upper bunk.  (*Id.* ¶ 7.)

8.  Approved accommodations are documented on an "accommodation chrono" form and kept in the inmate's prison records.  Inmates are also entitled to durable medical equipment (also referred to as DME) and medical supplies to either accommodate a disability under the ADA or as a temporary medical accommodation.  If it is the latter, then once the durable medical equipment is required, it should be returned.  (*Id.* ¶¶ 7, 10.)

9.  Prison officials take measures to ensure inmates are provided necessary accommodations and reasonable accommodations, which requires taking measures to ensure bottom bunks are available to accommodate inmates who need them for necessary and reasonable accommodations.  To ensure that the number of inmates with a bottom bunk or lower-tier cell accommodations does not exceed the number of bottom bunks and lower-tier cells, CDCR provides inmates accommodations only if they are medically necessary or as a reasonable accommodation.  This also requires the removal of existing accommodations that are no longer clinically indicated or required to reasonably accommodate an inmate under the ADA.  (*Id.* ¶¶ 8–9.)

10. On or about March 28, 2019, Plaintiff submitted a Form 1824 stating he was experiencing sleep issues and seeking a sleep study and a C-PAP assistance device.  (*Id.* ¶ 12 & Ex. A.)

11. On April 22, 2019, the RAP issued a response to the Form 1824, dated March 28, 2019, stating that he had been evaluated by his Primary Care Provider and approved for a sleep study.  (*Id.*)

12. On or about May 20, 2019, Plaintiff submitted a Form 1824 expressing dissatisfaction with a jockstrap that did not fit properly for hydrocele support.  (*Id.* ¶ 13 & Ex. B.)

13. On June 11, 2019, the RAP issued a response to the Form 1824, dated May 20, 2019, stating that a non-formulary DME had been ordered and approved to address the hydrocele support issue.  (*Id.*)

14. On June 10, 2019, Plaintiff submitted a Form 1824 stating difficulties with ambulation, standing, climbing stairs, and climbing his assigned bunk due to pain and inconvenience. (*Id.* ¶ 14 & Ex. C.)

15. Additionally, in the June 10, 2019 Form 1824, Plaintiff claimed that he had lumbar and thoracic injuries that were ignored for more than three years, but that he had been assigned to a temporary lower bunk in January 2019. Plaintiff requested a permanent lower bunk and to be coded DNM with limited stairs accommodation. (*Id.*)

16. On July 8, 2019, the RAP issued a response to the Form 1824, dated June 10, 2019, stating that Plaintiff had been seen and evaluated by his Primary Care Provider on June 13, 2019. According to the examination, Plaintiff was able to perform Activities of Daily Living ("ADLs") and ambulate without difficulties. (*Id.*)

17. On July 8, 2019, the RAP also granted a temporary lower bunk chrono until December 27, 2019. (*Id.*)

18. On or about July 8, 2019, Plaintiff submitted a Form 1824 stating that he was dizzy and losing his balance after he suffered a concussion from an assault. Plaintiff requested to be coded as DPM, to be assigned a seated walker, and for a lower-bunk chrono. (*Id.* ¶ 15 & Ex. D.)

19. On July 15, 2019, the RAP issued a response to the Form 1824, dated July 8, 2019, stating that he was already assigned to a lower bunk, so no bed move was needed. A temporary lower bunk was granted until December 27, 2019. Furthermore, Plaintiff was issued a temporary wheelchair on July 8, 2019, although he was evaluated by his Primary Care Provider and was determined to be performing his ADLs and ambulatory without difficulty. (*Id.*)

20. On or about November 14, 2019, Plaintiff submitted a Form 1824 stating that he was unable to stand up from a seated position without assistance during alarms. He requested a mobility impaired vest and to be coded DNM so he could remain standing during alarms. (*Id.* ¶ 16 & Ex. E.)

///

6

21. On November 14, 2019, the RAP issued a response stating that he was seen by his primary care physician on November 22, 2019, and he was dispensed a permanent mobility-impaired vest. (*Id.*)

22. On or about June 16, 2021, Plaintiff submitted a Form 1824 stating that his back went out and it was difficult to walk and move around due to severe pain. He requested an MRI of his back and a wheelchair. (*Id.* ¶ 17 & Ex. F.)

23. On July 12, 2021, the RAP issued a response stating that he was already issued a temporary wheelchair on June 16, 2021, and an MRI was ordered. Additionally, Plaintiff's medications for pain and previous imaging were reviewed. (*Id.*)

24. On or about November 21, 2021, Plaintiff submitted a Form 1824 stating that he was experiencing difficulty washing his lower legs and feet. He requested an ADA cell with a shower that has handrails and a permanent wheelchair. (*Id.* ¶ 18 & Ex. G.)

25. On December 14, 2021, the RAP issued a response stating that he was appropriately housed and informed of access to a shower chair. The RAP confirmed that his medical documents reflected a Disability Placement Program ("DPP") with grab bars. A permanent walker was also dispensed to Plaintiff. (*Id.*)

26. On or about November 23, 2021, Plaintiff submitted a Form 1824 stating that he was experiencing difficulty washing his lower legs and feet. He requested a shower that has handrails on the wall. (*Id.* ¶ 19 & Ex. H.)

27. On December 14, 2021, the RAP issued a response stating that, on November 23, 2021, Plaintiff was moved to a grab bar room. A permanent walker was also dispensed to Plaintiff. (*Id.*)

28. The RAP timely and appropriately responded to each of the Form 1824 requests submitted by Plaintiff. (*Id.* ¶ 20.)

29. The RAP and CDCR have no record of receiving any other Form 1824 Reasonable Accommodation Requests from Plaintiff. (*Id.*)

///

///

7

Plaintiff's Medical Care from May 2015 to June 2018

30. On April 30, 2015, Plaintiff was seen by a triage registered nurse based on Form 7362 request for a lower-bunk assignment. (ECF No. 40-6 ("Montegrande Decl.") ¶ 5 & Ex. 1-A.)

31. During the visit on April 30, 2015, the nurse confirmed that Plaintiff was ambulatory and was experiencing back pain on scale of six out of ten. (*Id.*)

32. During the visit on April 30, 2015, Plaintiff stated that he has back pain that radiates down his legs, and he had difficulty going up my bunk. (*Id.*)

33. As a result of Plaintiff's back pain complaint on April 30, 2015, the nurse scheduled Plaintiff for a follow up with his primary care physician, and informed Plaintiff to file a Form 7362 if the pain worsened, which Plaintiff did not do. (*Id.*)

34. On May 15, 2015, Plaintiff had an appointment with his primary care provider at the time, non-party Dr. El Said, to discuss Plaintiff's request for a lower-bunk accommodation. (*Id.* ¶ 6 & Ex. 1-B.)

35. On May 15, 2015, Dr. El Said noted that Plaintiff had chronic low-back pain, which can be caused by issues including strain to muscles or tendons in the back or arthritis. There had not been any previously documented, significant back-pain; however, Dr. El Said prescribed pain medication as part of his treatment for the lower-back pain. (*Id.*)

36. During the appointment on May 15, 2015, Dr. El Said had Plaintiff perform a Straight Leg Raise, which is a physical test commonly performed to test for diagnosis of sciatica (pain along the sciatic nerve caused by lumbar hernia) and lumbar disc hernia. Dr. El Said noted that the Straight Leg Raise test was negative, which indicated that Plaintiff was not experiencing back pain caused by a lumbar hernia. As this was Plaintiff's initial complaint of lower back pain and the findings from the physical evaluation and Straight Leg Raise were negative, Dr. El Said did not assign Plaintiff to a lower bunk. (*Id.*)

37. On October 30, 2015, Plaintiff had a chronic care appointment with Dr. Hill. During the appointment, Plaintiff complained that his testicles were swollen, which he claimed made it difficult for him to stand to do work. (*Id.* ¶ 7 & Ex. 2.)

38. On October 30, 2015, as part of the treatment plan, Dr. Hill reviewed Plaintiff's pain medication.  Plaintiff was prescribed a short course of medication that combines Tylenol and codeine (also referred to as "T3"), and naproxen for a longer duration.  Dr. Hill also ordered him to "lay in" for one week, and Dr. Hill advised Plaintiff to file a CDCR Form 7362, Health Care Services Request ("Form 7362"), if the swelling did not improve.  (*Id.*)

39. On October 30, 2015, Plaintiff did not raise any concerns about back pain or request a lower bunk chrono during the appointment on October 30, 2015.  (*Id.*)

40. On November 9, 2015, Plaintiff saw a nurse regarding his complaint of swollen and painful testicles.  He requested an extension of the T3 medication.  (*Id.* ¶ 8 & Ex. 3.)

41. On November 9, 2015, the nurse noted that Plaintiff was stable and ambulatory.  (*Id.*)

42. On November 9, 2015, the nurse did not note of Plaintiff complaining about his back pain, requesting a lower bunk chrono, or requesting any other ADA accommodation, during this appointment.  (*Id.*)

43. On November 16, 2015, Plaintiff had a chronic care appointment with Dr. Hill.  Plaintiff's chief pain complaint was that his testicles were swollen, which made it difficult for him to stand to do work.  (*Id.* ¶ 9 & Ex. 4.)

44. On November 16, 2015, Dr. Hill noted that a CT scan of Plaintiff's abdomen shows bilateral hydroceles, a swelling of the scrotum with fluid.  As part of the treatment plan, Dr. Hill reviewed Plaintiff's medication and prescribed a short course of T3 medication and naproxen for a longer duration.  Dr. Hill also prescribed a jock strap for support of the hydroceles and ordered for Plaintiff to "lay in" for two weeks.  Additionally, Dr. Hill advised Plaintiff to follow up with his primary care provider.  (*Id.*)

45. On November 16, 2015, Plaintiff did not report any issues relating to back pain, request a lower bunk chrono, or request any other ADA accommodation, during his appointment with Dr. Hill.  (*Id.*)

46. On December 3, 2015, Plaintiff had a chronic care appointment with his primary care provider, Dr. El Said.  During the visit, Plaintiff's main complaint was testicular pain caused by the hydrocele.  (*Id.* ¶ 10 & Ex. 5.)

9

47. On December 3, 2015, Dr. El Said noted that Plaintiff declined surgery for his hydroceles and that he did not recommend the long-term use of narcotics (T3) for pain management. Additionally, Dr. El Said scheduled a follow-up appointment with his psychiatrist to discuss a possible change in his antidepressant medication to Elavil, which also has pain relieving properties. (*Id.*)

48. Plaintiff did not complain of back pain, request a lower bunk chrono, or request any other ADA accommodation, during the appointment on December 3, 2015. (*Id.*)

49. On December 22, 2015, Plaintiff was seen by a nurse for testicular pain and requested an extension of the T3 medication. The nurse informed Plaintiff that the doctor would not renew the narcotic prescription. (*Id.* ¶ 11 & Ex. 6.)

50. On December 22, 2015, the nurse noted that Plaintiff was stable and ambulatory with a steady gait. Plaintiff did not complain of back pain, request a lower bunk chrono, or request any other ADA accommodation, during the visit. (*Id.*)

51. On December 25, 2015, Plaintiff was seen by a nurse due to lower abdominal pain caused by the hydroceles. Plaintiff reported that he was unable to sleep due to the pain. The nurse contacted the doctor, who prescribed a seven-day course of T3 medication. The nurse noted that Plaintiff was stable and ambulatory. (*Id.* ¶ 12 & Ex. 7.)

52. On December 25, 2015, Plaintiff did not complain of back pain, request a lower bunk chrono, or request any other ADA accommodation, during the visit. (*Id.*)

53. On December 31, 2015, Plaintiff had a follow-up appointment with his primary care provider, Dr. El Said. During the visit, Plaintiff's main complaint was left testicular pain caused by hydroceles. (*Id.* ¶ 13 & Ex. 8.)

54. On December 31, 2015, Dr. El Said documented that Plaintiff declined surgery for his chronic hydroceles, and that Dr. El Said would discontinue the use of narcotics while starting Motrin for pain management. (*Id.*)

55. On December 31, 2015, Plaintiff did not complain of back pain, request a lower bunk chrono, or request any other ADA accommodation, during the visit. (*Id.*)

///

10

56. On April 4, 2016, Plaintiff had a chronic care appointment with his primary care provider, Dr. El Said. Plaintiff's chief complaint during the visit was left testicular pain caused by hydroceles. (*Id.* ¶ 14 & Ex. 9.)

57. On April 4, 2016, Dr. El Said noted that Plaintiff had previously refused surgery for chronic hydroceles, but Plaintiff has changed his mind. Dr. El Said documented that he made a referral for surgery through a Physician's Request for Services, which was still pending. (*Id.*)

58. Additionally, on April 4, 2016, Dr. El Said noted that he would discontinue the use of narcotics and continue Motrin for Plaintiff's pain management. (*Id.*)

59. On August 17, 2016, Dr. Montegrande attended a chronic care appointment as Plaintiff's primary care provider. Plaintiff's chief complaint was lower-back pain. (*Id.* ¶ 15 & Ex. 10.)

60. During the August 17, 2016 appointment, Plaintiff reported that he had gained thirty pounds over eight months due to a lack of exercise and poor dietary choices. Furthermore, Plaintiff had been taking over-the-counter naproxen for pain, but requested a prescription for T3 medication. (*Id.*)

61. As part of the treatment plan, on August 17, 2016, Dr. Montegrande prescribed a dosage of 200 mg Naproxen, with a total of two tabs per day. Dr. Montegrande also provided Plaintiff with education on diet and exercise to manage his weight. (*Id.*)

62. On August 17, 2016, Plaintiff did not request a lower bunk chrono or any other ADA accommodation during this appointment, nor did not indicate [sic] that his back pain was interfering with his activities of daily living. (*Id.*)

63. On October 27, 2016, Dr. Montegrande conducted a meeting with Plaintiff to discuss an inmate appeal he had filed, requesting T3 medication for pain in his testicles from bilateral hydroceles. (*Id.* ¶ 16 & Ex. 11.)

64. During the October 27, 2016 meeting, Plaintiff expressed that Naproxen and ibuprofen were not as effective as T3 medication. Dr. Montegrande also discussed Plaintiff's refusal to undergo the recommended surgery for his hydroceles, as advised by his doctor. (*Id.*)

11

65. To alleviate Plaintiff's pain, on October 27, 2016, Dr. Montegrande prescribed T3 for a duration of fifteen days, with instructions to take one tablet per day.  Furthermore, Dr. Montegrande informed Plaintiff that he could take Tylenol 325 mg in between his T3 doses.  (*Id.*)

66. On October 27, 2016, Plaintiff did not request a lower bunk chrono or any other ADA accommodation during this appointment, nor did he indicate that his back pain was interfering with his activities of daily living.  (*Id.*)

67. On October 27, 2016, Dr. Montegrande submitted a Physician's Request for Services, referring Plaintiff to the general surgeon for his hydrocele surgery.  (*Id.* ¶ 17 & Ex. 12.)

68. On October 27, 2016, Dr. Montegrande indicated that Plaintiff had previously been referred to the general surgeon but had declined the surgery.  However, he now expressed willingness to undergo the surgery due to the increased size and heightened pain from the hydroceles.  (*Id.*)

69. On November 22, 2016, Dr. Montegrande had an appointment with Plaintiff to discuss his refusal to be seen by a surgeon to consult on surgery for his bilateral hydroceles.  (*Id.* ¶ 18 & Ex. 13.)

70. During the November 22, 2016 appointment, Plaintiff conveyed his decision to postpone the surgery for a few months, stating that the hydrocele had not significantly grown and the pain was manageable.  (*Id.*)

71. Furthermore, on November 22, 2016, Plaintiff expressed a preference for Trileptal, also known as oxcarbazepine, instead of T3 medication for pain management. Dr. Montegrande also noted that Plaintiff was ambulatory during this visit with a normal gait without any assistive device.  (*Id.*)

72. On November 22, 2016, Dr. Montegrande noted that the surgical evaluation would be rescheduled for a later time when Plaintiff decided to proceed with the surgery.  For the pain management, Dr. Montegrande recommended for Plaintiff to continue using oxcarbazepine at a dosage of 600 mg twice per day.  (*Id.*)

///

12

73. On November 22, 2016, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

74. On December 14, 2016, Dr. Montegrande saw Plaintiff for an appointment related to a Form 7362 request for the renewal of oxcarbazepine medication for chronic pain. Plaintiff reiterated his refusal to undergo surgery for his hydroceles during this appointment. (*Id.* ¶ 19 & Ex. 14.)

75. On December 14, 2016, Dr. Montegrande refilled the prescription for oxcarbazepine at the dosage of 300 mg twice per day for pain management. Dr. Montegrande also noted that Plaintiff was ambulatory during this visit with a normal gait and without an assistive device. (*Id.*)

76. On December 14, 2016, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

77. On December 20, 2016, Plaintiff consulted a nurse regarding his Form 7362 for his pain management medication. Plaintiff denied any acute complaints during the visit. Plaintiff stated that he discussed pain management medication with his doctor and wanted to confirm that the medication was renewed. (*Id.* ¶ 20 & Ex. 15.)

78. On December 20, 2016, the nurse confirmed that Plaintiff's prescription for oxcarbazepine for pain was renewed. The nurse also noted that Plaintiff was stable and ambulatory. (*Id.*)

79. On December 20, 2016, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

80. On May 24, 2017, Plaintiff attended an appointment with his nurse to discuss laboratory results, medications, and follow-up care. (*Id.* ¶ 21 & Ex. 16.)

81. On May 24, 2017, the nurse recorded that Plaintiff was stable and ambulatory and in no acute distress. (*Id.*)

*///*

82. On May 24, 2017, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

83. On September 8, 2017, Plaintiff was seen by a nurse to discuss his medication regimen. The nurse recorded that Plaintiff was stable and ambulatory and in no acute distress. (*Id.* ¶ 22 & Ex. 17.)

84. During the September 8, 2017 visit, the nurse extensively discussed with Plaintiff that there would be no changes to his medication as per his doctor's instructions. The nurse also discussed the option of surgery for his hydrocele, however, Plaintiff reiterated his refusal to undergo hydrocele surgery. (*Id.*)

85. On September 8, 2017, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

86. On September 27, 2017, Plaintiff was seen by a nurse to discuss a healthcare grievance he had filed. Plaintiff expressed concern about the doctor's reluctance to prescribe pain medication. (*Id.* ¶ 23 & Ex. 18.)

87. On September 27, 2017, the nurse noted that Plaintiff was stable and ambulatory and in no acute distress. (*Id.*)

88. On September 27, 2017, the nurse discussed with Plaintiff that he had been referred to a surgeon multiple times for hydrocele surgery, but Plaintiff continued to refuse the surgical option. (*Id.*)

89. On September 27, 2017, the nurse also consulted with the physician regarding Plaintiff's concerns about pain medication, and it was noted that oxcarbazepine, a pain medication, was not currently medically indicated and Plaintiff was being gradually weaned off it. (*Id.*)

90. On September 27, 2017, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

14

91. On January 10, 2018, Plaintiff consulted with a physician's assistant to discuss a healthcare grievance he filed regarding his request to be seen by a different primary care physician. During the appointment, Plaintiff also expressed his desire to have a prescription for T3 medication reinstated due to scrotal pain from his hydroceles. (*Id.* ¶ 24 & Ex. 19.)

92. On January 10, 2018, Plaintiff mentioned experiencing varying levels of pain and limitations, such as difficulty sleeping on his stomach, engaging in vigorous workouts, and prolonged standing or sitting, all attributed to his hydrocele. (*Id.*)

93. On January 10, 2018, Plaintiff expressed discontent with the doctors at Mercy Hospital and a preference to delay hydrocele surgery until he could have it performed elsewhere. (*Id.*)

94. On January 10, 2018, the physician's assistant, taking into account Plaintiff's chronic conditions and past history of substance dependence, strongly recommended avoiding narcotic pain medications whenever possible. (*Id.*)

95. As part of the pain management plan, on January 10, 2018, Plaintiff agreed to continue using NSAIDs in conjunction with Trileptal (oxcarbazepine). Additionally, Plaintiff was provided with a second scrotal support for alternating use with the one he already had. (*Id.*)

96. On January 10, 2018, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

97. On February 5, 2018, Plaintiff had a chronic care appointment with a physician's assistant regarding his hydroceles. The physician's assistant noted that, previously, an effort was made to manage Plaintiff's pain with Trileptal 600 mg twice per day. (*Id.* ¶ 25 & Ex. 20.)

98. On February 5, 2018, upon further review of Plaintiff's medical records, the physician's assistant noted that Dr. Narayan strongly warned against the use of Tripletal (oxcarbazepine) for Plaintiff. (*Id.*)

///

15

99. On February 5, 2018, the physician's assistant informed Plaintiff that Trileptal would be gradually discontinued. Plaintiff reported that Trileptal, along with Naproxen, had been helpful for his pain, but he expressed willingness to try a different medication. (*Id.*)

100. On February 5, 2018, the physician's assistant prescribed Elavil at a dosage of 25 mg daily, in addition to Naproxen twice daily, for pain management. Plaintiff reiterated his decision not to undergo surgery at that time. (*Id.*)

101. On February 5, 2018, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

102. On February 26, 2018, Dr. Montegrande saw Plaintiff for an appointment related to a Form 7362 request to increase the dosage of his Elavil for pain management. (*Id.* ¶ 26 & Ex. 21.)

103. On February 26, 2018, Dr. Montegrande reported that Plaintiff was argumentative about wanting to increase the dosage because he stated that Naproxen and Tylenol did not work. (*Id.*)

104. On February 26, 2018, Dr. Montegrande explained to Plaintiff that he needed to address his hydrocele, but Plaintiff disregarded the advice. Dr. Montegrande also informed Plaintiff that Trileptal, a medication recommended in the past, was not suitable for his condition according to his psychiatrist's recommendation. (*Id.*)

105. On February 26, 2018, Dr. Montegrande prescribed Plaintiff a dosage of 10 mg of Elavil daily for pain relief. (*Id.*)

106. On February 26, 2018, Plaintiff did not discuss his back pain, request a lower bunk chrono, or request any other ADA accommodation. Plaintiff also did not indicate that his back pain was interfering with his activities of daily living. (*Id.*)

107. On April 16, 2018, Plaintiff had an appointment with a nurse to discuss his medication regimen. (*Id.* ¶ 27 & Ex. 22.)

108. On April 16, 2018, the nurse noted that she explained to Plaintiff that he was being medicated within the CCHCS guidelines. She also informed Plaintiff that surgery was

16

still an option to correct his hydrocele, but that he would not be prescribed narcotic pain mediation on a long-term basis based on his refusal of curative procedures.  Plaintiff verbalized understanding and said that he would "consider it."  (*Id.*)

109.    On June 13, 2018, Plaintiff had his first appointment with a different primary care provider, Dr. Uddin.  (*Id.* ¶ 28 & Ex. 23.)

110.    On June 13, 2018, Dr. Uddin noted that  Plaintiff had a history of discogenic back pain from a car accident several years ago, and noted that amitriptyline and naproxen help for Plaintiff's pain.  (*Id.*)

111.    On June 13, 2018, Plaintiff did not discuss any history of fall events from the top bunk, nor did he request a lower bunk or other ADA accommodation.  (*Id.*)

Plaintiff's Medical Care from September 2018 to November 2019

112.    On September 26, 2018, Dr. Gill conducted an examination of Plaintiff and subsequently ordered an x-ray of his lumbar spine based on his documented history of chronic lower back pain.  (ECF No. 40-5 ("Gill Decl.") ¶ 6 & Ex. A.)

113.    On September 26, 2018, the findings from the x-ray showed that Plaintiff had severe degenerative changes present at L4-5 and L5-S1 and mild degenerative changes and a mild compression fracture within the lower thoracic spine.  (*Id.*)

114.    On October 18, 2018, Dr. Gill conducted a telemedicine chronic care appointment with Plaintiff with the assistance of a nurse, who assisted with the examination.  (*Id.* ¶ 7 & Ex. B.)

115.    On October 18, 2018, Plaintiff expressed confusion regarding the purpose of the appointment.  (*Id.*)

116.    On October 18, 2018, Dr. Gill discussed some of Plaintiff's medical concerns, including his lower back pain.  (*Id.*)

117.    On October 18, 2018, Dr. Gill adjusted Plaintiff's pain medication and advised him to submit a request to be seen in the clinic if his back pain persisted or worsened. Additionally, Dr. Gill informed Plaintiff to seek immediate medical attention if he experienced any red flag signs or symptoms.

118.    On October 18, 2018, Plaintiff was ambulatory and confirmed that he was able to perform activities of daily living without difficulty and had no red flag signs or symptoms. (*Id.*)

119.    On October 18, 2018, Plaintiff did not discuss any history of fall events from the top bunk, nor did he request a lower bunk or other ADA accommodation, or mention his back pain interfering with his activities of daily living. (*Id.*)

120.    On January 10, 2019, Dr. Gill conducted a telemedicine appointment with Plaintiff, with the assistance of a nurse. (*Id.* ¶ 8 & Ex. C.)

121.    The appointment on January 10, 2019 with Dr. Gill related to a reasonable accommodation request Plaintiff submitted through the reasonable accommodation process involving the RAP. (*Id.*)

122.    In his reasonable accommodation request at issue on January 10, 2019, Plaintiff outlined several requests for accommodation, including a lower-bunk accommodation, a back brace, an increase in pain medication dosage and timing, and a reassessment of his hydroceles. (*Id.*)

123.    During the January 10, 2019 visit, Plaintiff mentioned having a long-standing hydrocele and previously seeing an outside specialist who recommended surgery, which he declined. He further explained that the hydrocele had increased in size over the past year, causing discomfort during activities such as walking, prolonged standing, and using the top bunk. (*Id.*)

124.    On January 10, 2019, Plaintiff was ambulatory and confirmed that he was able to perform activities of daily living without difficulty and had no red flag signs or symptoms. (*Id.*)

125.    On January 10, 2019, Dr. Gill issued Plaintiff a temporary lower bunk, referred him for further evaluation of his hydroceles by urology, increased his pain medication dosage, and instructed it to be administered twice daily. (*Id.*)

126.    On March 26, 2019, Dr. Gill conducted a telemedicine chronic care appointment with Plaintiff, with the assistance of a nurse, to address his ongoing conditions, which

18

included his chronic back pain and hydroceles.  (*Id.* ¶ 9 & Ex. D.)

127.    On March 26, 2019, Dr. Gill noted that Plaintiff was taking amitriptyline to treat his back pain, which he stated helped with his back pain.  (*Id.*)

128.    On March 26, 2019, Dr. Gill noted that Plaintiff was not experiencing any back pain, and he was ambulatory and able to perform activities of daily living without difficulty.  (*Id.*)

129.    On April 10, 2019, Dr. Gill conducted a telemedicine appointment with Plaintiff, with the assistance of a nurse, following his submission of a reasonable accommodation request.  (*Id.* ¶ 10 & Ex. E.)

130.    In his reasonable accommodation request at issue for the April 10, 2019 appointment, Plaintiff requested to be evaluated for a head wound, sleep study, follow-up urology consultation, and follow-up lipid panel.  (*Id.*)

131.    On April 10, 2019, Dr. Gill ordered a sleep study for Plaintiff in response to the reasonable accommodation request.  (*Id.*)

132.    On May 20, 2019, Dr. Gill conducted a telemedicine appointment with Plaintiff, with the assistance of a nurse, following his submission of a reasonable accommodation request, in which he requested a larger cup size for his hydroceles.  (*Id.* ¶ 11 & Ex. F.)

133.    On May 20, 2019, Dr. Gill ordered for Plaintiff to be provided with a larger support.  (*Id.*)

134.    On June 11, 2019, Dr. Gill conducted a telemedicine appointment with Plaintiff, with the assistance of a nurse, to discuss intermittent dizziness that he was experiencing.  (*Id.* ¶ 12 & Ex. G.)

135.    During the June 11, 2019 appointment, Dr. Gill counseled Plaintiff on having further work-up with cardiology, which he refused.  (*Id.*)

136.    On June 13, 2019, Dr. Gill conducted a telemedicine appointment with Plaintiff, with the assistance of a nurse, to follow-up on Plaintiff's sleep study results and to discuss his reasonable accommodation request for mobility issues and a lower-bunk assignment.  (*Id.* ¶ 13 & Ex. H.)

19

137.    On June 13, 2019, Dr. Gill observed Plaintiff walking very comfortably without any difficulties, and Plaintiff confirmed that he was able to perform activities of daily living. (*Id.*)

138.    However, on June 13, 2019, Dr. Gill granted Plaintiff's request for a lower-bunk chrono due to his hydroceles, which caused him discomfort when trying to pull himself onto the top bunk. (*Id.*)

139.    On July 9, 2019, Dr. Gill conducted a telemedicine appointment with Plaintiff, with the assistance of a nurse, following his submission of a Form 7362 requesting an adjustment to his medication. (*Id.* ¶ 14 & Ex. I.)

140.    On July 9, 2019, Dr. Gill granted Plaintiff's request to decrease the dosage of the pain medication Elavil from 50 mg to 25 mg, twice per day. (*Id.*)

141.    On August 2, 2019, Dr. Gill had a telemedicine appointment with Plaintiff with the assistance of a nurse. Plaintiff requested an x-ray for his upper back, pain medication for his lower back, and better support for his hydroceles. (*Id.* ¶ 15 & Ex. J.)

142.    On August 2, 2019, Dr. Gill noted that Plaintiff had chronic lower back pain and had made previous visits requesting adjustments to his medication, including dosage increases and decreases. (*Id.*)

143.    On August 2, 2019, Dr. Gill did not adjust Plaintiff's pain medication during this appointment, as Plaintiff confirmed that he was ambulatory and performing activities of daily living. Dr. Gill advised Plaintiff to continue doing stretching exercises and Dr. Gill would provide Tylenol as needed for Plaintiff's arthritis in his back. (*Id.*)

144.    On August 2, 2019, Dr. Gill also ordered x-rays of the upper-back and follow up results. Additionally, Plaintiff requested improved support for his hydroceles, and therefore Dr. Gill scheduled a telemedicine appointment with urology for further evaluation. (*Id.*)

145.    On August 16, 2019, Dr. Gill conducted a telemedicine appointment with Plaintiff as a follow-up on a urology consultation performed on August 2, 2019. (*Id.* ¶ 16 & Ex. K.)

146.    On August 16, 2019, Plaintiff informed Dr. Gill that he did not want to have surgery at the time.  Dr. Gill then submitted a request for a hydrocele support recommended by urology.  (*Id.*)

147.    On September 16, 2019, Dr. Gill attended a telemedicine examination of Plaintiff with the assistance of a nurse for a chronic care assessment.  (*Id.* ¶ 17 & Ex. L.)

148.    On September 16, 2019, Dr. Gill observed Plaintiff walking into the examination room very comfortably and without any difficulties.  (*Id.*)

149.    On September 16, 2019, Dr. Gill counseled Plaintiff on his bilateral hydroceles, which were stable.  Dr. Gill also counseled Plaintiff on his lower back pain, and he reported that he currently had no back pain.  Dr. Gill noted that Plaintiff's back pain is being managed with amitriptyline, and that he was ambulatory and could perform his activities of daily living.  Dr. Gill noted that Plaintiff did not need a cane or walker at that time.  (*Id.*)

150.    On October 2, 2019, Dr. Gill met with Plaintiff for a telemedicine appointment as a follow-up for his lipid panel results.  (*Id.* ¶ 18 & Ex. M.)

151.    During October 2, 2019 visit, Dr. Gill counseled Plaintiff on the risks of uncontrolled lipid panel, along with diet and exercise.  (*Id.*)

152.    On October 11, 2019, Dr. Gill examined Plaintiff and subsequently ordered another x-ray of the thoracic spine.  (*Id.* ¶ 19 & Ex. N.)

153.    The findings from the x-ray ordered on October 11, 2019 showed that Plaintiff had mild degenerative changes at multiple levels, but there were no significant abnormalities of the bone.  (*Id.*)

154.    On November 22, 2019, Dr. Gill had a telemedicine appointment with Plaintiff, with the assistance of a nurse, for an examination for a reasonable accommodation request for a disability vest and scrotum compression support for hydroceles.  (*Id.* ¶ 20 & Ex. O.)

155.    During the examination on November 22, 2019, Plaintiff informed Dr. Gill that he refused to have surgery on the hydroceles, and Dr. Gill advised Plaintiff that if he changed his mind to submit a request to be seen in the clinic.  (*Id.*)

156.    On November 22, 2019, Dr. Gill issued Plaintiff a mobility vest based on his stated difficulty getting on the ground quickly for an alarm.  Dr. Gill also informed the nurse to follow up on when Plaintiff would receive the compression support recommended by urology.  (*Id.*)

157.    Plaintiff received medically appropriate treatment for his medical conditions, specifically his hydroceles and back pain.  Adequate pain management measures were implemented, and Plaintiff did not continue reporting difficulties related to accessing his top bunk or engaging in activities of daily living.  (*Id.* ¶ 21; Montegrande Decl. ¶ 29.)

158.    During the relevant period, Plaintiff did not disclose to his doctors or any other medical personnel any incidents of falling from his top bunk as a result of back pain and sustaining injuries.  (Gill Decl. ¶ 22; Montegrande Decl. ¶ 30.)

The CDCR Form 22's Produced by Plaintiff in Discovery

159.    Before 2021, CDCR inmates and parolees could submit a CDCR Form 22, also known as a "Request for Interview, Item, or Service," to address an issue related to their confinement or parole.  (ECF No. 40-3 ("Castro Decl.") ¶¶ 3–4.)

160.    The process required inmates (or parolees) to complete a Form 22, wherein they describe the specific request.  Inmates were then required to deliver or mail the completed form through institutional mail to any staff member capable of addressing the issue.  (*Id.* ¶ 4.)

161.    If the form was mailed by the inmate, a receipted copy of the request could be returned by staff through the mail.  Upon receiving a completed Form 22, the staff member was required to accept, date, and sign the form.  (*Id.* ¶ 5.)

162.    The staff member would then provide the bottom copy of the signed form to the inmate or parolee as a receipt, confirming the date of submission.  At the staff member's discretion, they could respond to the request immediately or choose to respond within the specified timeframe.  (*Id.*)

163.    The receipt of a completed form did not prevent staff from forwarding it to a more suitable responder.  However, within twenty-four hours, employees were expected to

22

either deliver the form to the designated staff member or send it through institutional mail addressed to the appropriate recipient. (*Id.* ¶ 6.)

164.    Within three working days of receiving the form, the staff member responsible for responding would note their decision or action on the form, sign and date it, retain a copy for their records, and return the original and remaining copy to the inmate or parolee. (*Id.*)

165.    If the inmate or parolee expressed dissatisfaction or disagreement with the staff member's response, they had the option to submit the form to the employee's supervisor for review while retaining a copy for their own records. (*Id.* ¶ 7.)

166.    If the staff member's supervisor was not available, the inmate or parolee could submit the form to another supervisor within the office or unit in question. (*Id.*)

167.    Within seven calendar days of receiving the Request for Interview, Item or Service form, the supervisor would indicate their decision or action on the form, sign and date it, ensure that a copy was made and retained in the facility records for the specified retention period, and return the original to the inmate or parolee. (*Id.* ¶ 8.)

168.    Plaintiff claims that he requested certain accommodations including a lower bunk chrono by submitting a Form 22 to "HCCA/RAP" on the following dates: February 2, 2016 (claiming that he fell while descending from upper bunk and hit the toilet and injured hip); April 12, 2016 (claiming that he fell to the floor and twisted knee and reinjured lower back); June 23, 2016 (claiming that he fell off the bunk and hit head and reinjured lower back); August 18, 2016 (claiming that he fell to the ground and twisted ankle and reinjured lower back); September 22, 2016 (claiming that he fell while descending from upper bunk and injured wrist and injured lower back); November 5, 2016 (claiming that he fell while descending from upper bunk and reinjured lower back); February 2, 2017 (claiming that he fell while descending from upper bunk and injured lower and middle back); April 10, 2017 (claiming that he fell while descending from upper bunk and caused further injuries to lower back); June 5, 2016 (claiming that he fell while descending from upper bunk and injured his shoulder and lower back); August 25, 2017 (claiming that he fell while descending from upper bunk and injured his left wrist

and lower back); July 12, 2018 (claiming that he fell while descending from upper bunk and injured his head and back); August 2, 2018 (claiming that he fell while descending from upper bunk and injured his head and back); September 10, 2018 (claiming that he fell while descending from upper bunk and injured his head and lower back); October 8, 2018 (claiming that he fell while descending from upper bunk and injured hand and shoulder); October 19, 2018 (claiming that he fell while descending from upper bunk and injured back); November 26, 2018 (claiming that he fell while descending from upper bunk and reinjured back); and December 14, 2018 (claiming that he fell while descending from upper bunk and he injured head and back).  (*Id.* ¶ 9 & Ex. A; Davi Decl. ¶ 21.)

169.     Plaintiff alleges that he notified CDCR of the need for a lower bunk and a shower chair by mailing a Form 22's to "HCCA/RAP" on the following dates: January 20, 2016 (requesting lower bunk, shower chair, and ADA shower); February 16, 2016 (requesting lower bunk and shower chair); March 22, 2016 (requesting lower bunk and shower chair); April 20, 2016 (requesting lower bunk and shower chair); May 27, 2016 (requesting lower bunk, shower chair, and ADA shower) June 26, 2016 (requesting lower bunk, shower chair, and ADA shower).  (Castro Decl. ¶ 10 & Ex. B; Davi Decl. ¶ 22.)

170.     Reasonable Accommodation Panel ("RAP") and California Correctional Health Care Services ("CCHCS") conducted a thorough search of their records pertaining to inmate Plaintiff for the aforementioned Form 22 documents.  Following the investigation, the RAP and CCHCS found no records indicating receipt of the aforementioned Forms 22s.  (Castro Decl. ¶¶ 11–13; Davi Decl. ¶¶ 21–23.)

171.     Furthermore, there is no record of any response being issued to any Form 22, which would have been mandatory had they received such requests.  (Castro Decl. ¶ 11; Davi Decl. ¶ 23.)

172.     Plaintiff also did not address the issues raised in the Form 22's with his doctors at or around the time of allegedly submitting them.  (Gill Decl. ¶¶ 22–23; Montegrande Decl. ¶¶ 30–32.)

///

24

**B.    Parties' Positions**

Defendant contends that CDCR acted consistent with the ADA when Dr. El Said performed a physical evaluation and testing of Plaintiff's back pain, and ultimately did not assign Plaintiff to a bottom bunk.  The undisputed material facts establish that Plaintiff did not have a medical necessity when he requested lower-bunk accommodation for back pain in April 2015.  The medical records demonstrate that over the course of three years, Plaintiff experienced over twenty medical encounters and never made another request for a lower-bunk assignment, or request any other ADA accommodation for back pain during this time.  Furthermore, Plaintiff continued to meaningfully participate in the housing program until a lower bunk was granted, based on a different medical condition, in January 2019.  And, even if the Court concludes Plaintiff can proceed on his ADA claim, he cannot seek damages because he cannot establish that CDCR acted with deliberate indifference—the additional element he must prove to receive damages.

In opposition, Plaintiff argues that his back pain was a qualifying basis for a low bunk accommodation in April 2015, and Dr. El Said's failure to perform an x-ray or MRI to investigate Plaintiff's need for a low bunk is indicative of intentional discrimination.  The subsequent x-rays and MRI exams, when finally performed in 2018, confirmed "severe degenerative changes" in "L4-L5-S1" and "thoracic fracture," revealing that Dr. El Said's exam was not thorough and cannot constitute the required investigation.  Plaintiff further declares, under penalty of perjury, that he orally requested a bottom bunk during all visits with medical staff since April 2015, he presented his April 2015 Form 7362 and 22 Forms at each medical encounter thereafter, invoking the same ask, and he did not fabricate or back date any evidence in this case.

**C.    Analysis**

Based on the record before the Court, the Court finds that Defendant has failed to carry its burden of showing that there is no genuine dispute as to any material fact and that Defendant is entitled to judgment as a matter of law.

Referencing the same documentary evidence, the parties have each submitted declarations, signed under penalty of perjury, to support their assertions that Plaintiff either did or

did not send the submit the relevant Form 22s regarding Plaintiff's lower bunk accommodation request and complaints of lower back pain. UMF 170–172; (ECF No. 43, p. 6.) Despite Plaintiff's failure to specifically dispute Defendant's Statement of Undisputed Material Facts, the facts set forth by Defendant themselves demonstrate that a significant dispute exists as to whether Plaintiff submitted any of the twenty-four Form 22s Plaintiff produced during discovery. Plaintiff alleges that he repeatedly mailed the Form 22s, dated January 20, 2016 through December 14, 2018, to "HCCA/RAP," or the Health Care Compliance Analyst/Reasonable Accommodation Panel. UMF 168, 169; (ECF No. 43, p. 44). The Form 22s request certain accommodations, including a lower bunk chrono and a shower chair, documenting Plaintiff's falls and subsequent injuries, and requesting investigations of his accommodation requests pursuant to the Armstrong Remedial Plan ("ARP"). UMF 168, 169. In his opposition, Plaintiff further declares, under penalty of perjury, that he presented the Form 22s at each medical encounter over time, to staff, and that he did not fabricate or back-date any evidence in this case. (ECF No. 43, p. 6.) Defendant's assertion that the RAP and CCHCS conducted a thorough search of their records and found no records indicating receipt of Plaintiff's Form 22s or the issuance of any response to any Form 22, or that there is no indication in Plaintiff's medical records that Plaintiff attempted to address the issues raised in the Form 22s with his doctors, merely confirms that a dispute of fact remains between the parties. UMF 170–172.

Accepting either party's version of events as true could certainly affect the outcome of the case under the applicable law. If Plaintiff submitted repeated requests for a lower bunk accommodation due to his chronic back pain, both by mail and during medical encounters, over the course of nearly three years, and these requests went unaddressed and undocumented, a trier of fact could find that this course of events constituted intentional discrimination and deliberate indifference on the part of Defendant.

At the summary judgment stage, it is impermissible for the Court to assess the credibility of the witnesses or weigh the evidence. *Soremekun*, 509 F.3d at 984; *T.W. Elec. Serv., Inc., v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). Thus, in a battle of dueling declarations, the winner may not be declared based upon the number of declarations

26

submitted or the contents therein, so long as the declarations in question are based on personal knowledge of facts admissible in evidence.  Defendant's position is supported with Plaintiff's medical records and additional declarations, while Plaintiff's position is supported by Plaintiff's declaration and the aforementioned Form 22s.  This is not a case where Plaintiff has presented only a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence" to support his version of events.  *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997).  Accepting Defendant's argument that Plaintiff's allegations that he submitted the Form 22s detailing his repeated requests for accommodations are "not supported by the evidence" requires the Court to make a credibility determination as to the Form 22s in the record, as well as Plaintiff's declaration signed under penalty of perjury, or to otherwise weigh conflicting evidence.  The Court may not do so at the summary judgment stage.

As a result, the motion for summary judgment fails to establish that there is no genuine dispute of material fact.  Accordingly, the Court finds that Defendant is not entitled to judgment as a matter of law.

**IV.    Conclusion and Recommendation**

For the reasons explained above, the Court finds that Defendant CDCR is not entitled to summary judgment on Plaintiff's claim for violation of the ADA.

Accordingly, IT IS HEREBY RECOMMENDED that Defendant's motion for summary judgment, (ECF No. 40), be DENIED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  **Objections, if any, shall not exceed fifteen (15) pages or include exhibits.  Exhibits may be referenced by document and page number if already in the record before the Court.  Any pages filed in excess of the 15-page limit may not be considered.**  The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual

27

findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 23, 2026**          /s/ *Barbara A. McAuliffe*
                                        UNITED STATES MAGISTRATE JUDGE

28